Argued and submitted May 5, accused reprimanded July 24, 1980

In re: Complaint as to the Conduct of
# HERBERT B. GALTON,
*Accused.*
## (OSB 1332, SC 26991)
615 P2d 317

Carrell F. Bradley, of Schwenn, Bradley, Batchelor and Brisbee, Hillsboro, argued the cause and filed the briefs for accused.

Eugene E. Feltz, of Casey, Palmer, Feltz & Sherry, Portland, argued the cause and filed the brief for the Oregon State Bar.

Before Denecke, Chief Justice, and Tongue, Howell, Lent, Linde and Tanzer, Justices.

PER CURIAM.

## PER CURIAM.

This is a disciplinary proceeding originating from an anonymous letter to the Oregon State Bar. The letter was as follows:

"6/23/76

"How can a lawyer (Herb Galton) represent both sides in a transaction that involves the give-away of corporate assets? Is that ethical?

"A concerned union member"

Following its investigation the Bar instituted this disciplinary proceeding in which the accused was originally charged with unethical conduct in seven specifics and with an eighth charge that accused's course of conduct, in the aggregate, was such as to render him unfit to practice law. Upon motion of the Bar, the fifth and seventh charges were dismissed at the Trial Board level.

The Trial Board found the accused not guilty on the remaining charges. In its statement in partial opposition to the report of the Trial Board,[1] the Bar affirmatively stated that it did not oppose the Trial Board's finding of not guilty on the sixth charge.

Pursuant to Section 46.2, Rules of Procedure Relative to: Admission, Discipline, Resignation and Reinstatement (hereinafter "Rules"), the matter was transmitted to the Review Board, which rendered and filed its written decision. ORS 9.535(2)[2] and Section

---

[1] Section 46.2, Rules of Procedure Relative to: Admission, Discipline, Resignation and Reinstatement.

[2] ORS 9.535 provides in part:

"(1) The board of governors shall appoint a review board, under the rules of procedure of the state bar, which shall review the transcript, report and recommendation of the trial board. At least one member of the review board shall be a representative of the general public, not a member of the state bar. The review board may adopt, modify or reject the report and any recommendation of a trial board, may take additional evidence or rerefer the matter to a trial board for further proceedings.

46.6, Rules. The Review Board agreed with the Trial Board on the disposition of all charges except the third and found the accused guilty of that charge. The Review Board recommended that the accused be reprimanded. ORS 9.535(1) and (2) and Section 46.6, Rules.

The matter is now before this court pursuant to ORS 9.535(3) and Sections 47 and 48, Rules, for disposal pursuant to ORS 9.535(4). In this court the Bar urges that the accused be found guilty of the first, second, third and fourth specific charges and of the eighth charge (the aggregate conduct charge). Our disposition of the specific charges establishes that the accused is not guilty of the eighth charge.

The remaining four charges are based upon a contention that the accused from May, 1969, to November, 1974, had an attorney-client relationship with Great Western Mortgage Company (hereinafter

---

"(2)  The review board shall render, and file with the executive director of the state bar, a written decision on the proceedings. Notice and a copy of the decision and recommendation of the review board, certified by the executive director, immediately shall be transmitted by the executive director by registered or certified mail to such member or applicant, as the case may be, at his last-known post-office address; and the executive director shall file with the State Court Administrator a copy of the decision and recommendation, certified by the executive director, with the transcript and findings, and the entire record of the proceeding.

"(3)  Counsel for the state bar or the accused or applicant may, within 30 days after the filing with the State Court Administrator of the decision and recommendation of the review board in a disciplinary, admission or reinstatement matter, petition the Supreme Court to adopt, modify or reject the same. On review by the Supreme Court of the decision and recommendation, the Supreme Court after due notice and such hearing as it shall determine, may adopt, modify or reject the same, in whole or in part, and thereupon shall make an appropriate order.

"(4)  When the Supreme Court issues its order after review of any decision or recommendation of the review board, it may award judgment for the prevailing party for the party's actual and necessary costs and disbursements incurred in the disciplinary, admission or reinstatement proceeding. The procedures for recovery of such costs and disbursements shall be the same as in civil cases.

"* * * * *."

"GWM")[3] and that he was guilty of misconduct with respect to his representation of four other separate clients, whose interests were adverse to those of GWM.

In early 1969 GWM formulated a program whereby unions and health and welfare and pension trusts, which were jointly managed by employer and labor trustees and established pursuant to collective bargaining agreements, would invest trust funds with GWM. GWM was to use the monies to purchase from banks interests in mortgages. The banks would loan the monies for various construction projects,[4] taking mortgages as security. The bank would then sell a participating interest in the loans and security to GWM, and out of the return upon the investment GWM was to pay principal and interest (at attractive rates) to the trusts. The banks were to guarantee payment to GWM.

The record discloses that GWM failed to perform according to the formulated program and was eventually placed in some sort of receivership. The failure to perform left Carpenters' Local Union No. 226, the Floor Covering Union and Industry Welfare Fund, the Office and Professional Employees Union, Local 11, Health and Welfare and Dental Trust Fund, and the Oregon and Southwest Washington Painters Pension Trust with several hundred thousand dollars of unsecured claims for monies invested with GWM.

### First Charge

The first charge is that the accused, while having an attorney-client relationship with GWM and thereby being privy to the confidences of that client,

---

[3] It was also charged that accused was attorney for GWM's principals, Robert Garner and Garland Bramble. We find no evidence that accused's representation of either principal personally is the source of any unethical conduct charged; therefore, we do not further deal with that relationship.

[4] It was considered that this kind of investment would help to provide jobs for those workers who were the beneficiaries of the various trusts and members of the various unions which would be making the investments.

also represented Carpenters' Local Union No. 226 and gave that Local advice as to the legality and safety of investing with GWM under the program described above.

The Bar concedes that the accused did not represent the Local, as such. The accused admits that he represented the Northwestern Oregon District Council of Carpenters (hereinafter "Council"), of which Local 226 was a member along with 10 or 11 other local unions. There was evidence from which it could be found that the Local felt accused's relationship with the Council was such that he would have the Local's interests in mind with respect to investments with GWM. Witness Wickstrand, who was involved with decisions as to the investment of the Local's funds, testified in part:

"* * * we took it for granted that Herb was watching out for the District Council, he was watching out for Great Western. We weren't going to get in trouble because Herb was our friend and he was going to watch out for us. He was playing both sides and we figured, hell, he was watching out for that company, has got to be good or he wouldn't be connected with it."

The losing investments were not made by the District Council but by the Local. There is nothing to indicate that the accused was aware that because he represented both the Council and GWM, the Local, as a member of the Council, would consider his attorney-client relationship with GWM as a representation to the Local that an investment with GWM would be prudent. The services performed by the Accused for the Council had nothing to do with such investments.

■ We agree with the Review Board:

"However, even if we assume that representation of the District Council includes representation of Local 226, the services rendered to the respective parties were unrelated and involved no conflicts of interest."

Accordingly, we find the accused not guilty of the first charge.

## *Second Charge*

■　　The second charge is that the accused, while having an attorney-client relationship with GWM and thereby being privy to the confidences of that client, also represented the Floor Covering Union and Industry Welfare Fund and gave the trustees of that Fund advice as to the legality and safety of investing with GWM without disclosing to those trustees his relationship with GWM.  This charge concerns an investment with GWM made by the trustees for the Fund sometime between two meetings of the trustees held, respectively, on May 11, 1970, and October 13, 1970.

One of the labor trustees testified that the accused was present at the meeting of May 11, that he was specifically asked for advice about the contemplated investment with GWM, that he opined it to be "wise and prudent," that he did not disclose his relationship with GWM, and that the trustees relied upon his advice in making the investment. The witness also testified that the accused was at the October 13 meeting where the investment was ratified. The witness purported to have some vague recollection of an intervening meeting of the trustees concerning this investment, at which the accused was present.

Opposed to this evidence was the testimony of an employer trustee of the Fund that the accused was at neither the May 11 nor the October 13 meeting. This witness could recall no intervening meeting. Neither the minutes of May 11 nor October 13 show the accused as being present, although other persons than the trustees who were present were identified by name. The minutes of October 13 disclose approval of the minutes of May 11 and make no mention of any intervening meeting. The accused testified that he was not present at either meeting.

We find this charge has not been proven and find the accused not guilty thereof.

### *Fourth Charge*

■ The amended[5] fourth charge is that the accused, in connection with the liquidation of GWM, participated in the preparation and filing of a claim against GWM's receiver on behalf of accused's other client, the Oregon and Southwest Washington Painters Pension Trust. It is charged that this constituted accepting employment in which there existed a likelihood of the use of confidential information gleaned from GWM for the benefit of the Trust. It is further alleged that this placed the accused in a position which could result in the appearance of impropriety.

The claim was filed in June, 1975. We find that the accused did not represent GWM after November, 1974. We agree with the Trial Board that it is difficult to see how any information the accused might have gained as attorney for GWM could have any effect upon the filing of the claim with the receiver. Insofar as the preparation of the claim is concerned, the uncontradicted evidence is that Paul Hybertsen, the lawyer retained as co-counsel for the Trust by the employer members, prepared the form of claim and submitted it to the accused for approval more as a matter of courtesy than anything else. The accused's participation in the preparation of this claim was scant indeed.

---

[5] The Trial Board allowed amendments to both the third and fourth charges. The amendments to the fourth charge were substantial. The original complaint does not show by interlineation or obliteration any of those amendments. There was no amended complaint filed. The text of the amendments must be gleaned from a search of the transcript. We realize that a group of lawyers serving as a Trial Board is contributing its time "for the good of the order," but the failure to cause the amendments to be reflected in the pleadings themselves results in false starts for the Review Board and this court. Where amendment to the pleadings is allowed by interlineation or obliteration, the chairman of the Trial Board should take care that this is physically performed forthwith. If amendment is otherwise allowed, counsel should be required to submit an amended pleading.

Having said that, we would note that the Trial Board in this case submitted an excellently organized written decision and appended thereto a list of exhibits received. In this respect the work of the Trial Board was of uncommon aid to this court in its review.

We agree with the Review Board:

"It is difficult to believe that the public would view this conduct with any suspicion or opprobrium."

We find the accused not guilty of this charge.

### Third Charge

The third charge is that the accused had an attorney-client relationship with GWM from 1969 through the time with which this charge is concerned and that as attorney for GWM he prepared documents and opinions for GWM and was privy to confidential information from that client. It is charged that in the same time period he was employed as attorney and performing the same kind of services for the Office and Professional Employees Union No. 11 Health and Welfare Trust and Dental Trust and was thereby privy to confidential information from the Trusts. He is charged with advising the Trusts

"as to the legality and safety of investing funds thereof in investments sold or arranged for a consideration by GWM"

and failing to disclose to the Trusts his representation of GWM. The Bar charges that this concurrent representation

"constituted accepting employment in which there existed the likelihood of the use of confidential information gained from a current or former client."

In addition, the Bar charges that this concurrent representation placed the accused in a position "which could result in an appearance of impropriety." Moreover, it is charged that this concurrent representation placed the accused in a position

"where the Accused's professional judgment as a lawyer could not be exercised for a client free of compromising interests and loyalties."

The Bar further charges that this concurrent representation of GWM and the Trusts deprived the latter of the

"opportunity to secure disinterested advice on the question of the legality and safety of investing its funds in investments sold or arranged for a consideration by GWM."

The accused does not deny that in May of 1971 he had been employed to perform legal services for the Trusts. A copy of the minutes of the meeting of the trustees held on May 3, 1971, shows that Willard Mayfield was one of the employer trustees present and that Walt Engelbert was one of the employee trustees present. Item 9 of the minutes is pertinent:

"Mr. Mayfield placed before the Trustees the matter of appointing an attorney to draw up the necessary Trust amendments or revisions so that the Dental and Health and Welfare Trusts could be combined. Mr. Engelbert indicated that he desired to have Mr. Herbert Galton appointed and there was a brief discussion relative to this matter. Mr. Mayfield stated that if there were no objections, he would recommend that Mr. Galton draw up the required documents and the Employer Trustees could have the documents reviewed by their respective attorneys. There were no objections to Mr. Mayfield's recommendation and the Chairman instructed the Administrator to inform Mr. Galton of the Trustees request."

In evidence is a copy of the minutes of a meeting of the trustees held May 11, 1971. The minutes show that Donald Balsiger and Willard Mayfield were two of the employer trustees present. Walt Engelbert is shown as being one of the employee trustees present. Also being shown as present were Joseph H. Herrle as an administrator, James B. Nibley as a consultant and "Herb Galton, Attorney" as a guest. In pertinent part the minutes show:

"3. Mr. Engelbert introduced Mr. Herb Galton, Attorney, and stated that Mr. Galton had been requested to discuss the Trust's investment with Great Western Mortgage Company and the merger of the Health and Welfare Trust Fund with the Dental Trust Fund.

"Mr. Engelbert stated that the concern of the Trustees was with both the security of the investment and that the assets of the Trust are sufficiently liquid.

"Mr. Galton said that Article VII of the Dental Trust Fund permits the Trust to merge with other Trusts, however, the Health and Welfare Trust Fund is not so definitive. He further stated that the Trusts can merge and that for economical reasons, he would recommend that the action be taken. The Trustees instructed Mr. Galton to proceed with the preparation of the required legal documents.

"Mr. Herrle informed Mr. Galton that approximately 50%of the contributing employers to the Health and Welfare Fund had not contributed to the Dental Program. Mr. Mayfield stated he felt it would be unfair to convert Dental funds to Health and Welfare participants who have not contributed.

"4.   Mr. Galton stated that he was prepared to speak on the investments of the Dental Trust Fund with the Great Western Mortgage Company and that he was primarily a labor attorney and that his practice is heavily involved in union cases. Mr. Galton further stated that he is well acquainted with the principals of Great Western Mortgage Company and that their professional integrity is above reproach. According to Mr. Galton, the participation certificates are secured four ways:

"(1)   A first Mortgage
"(2)   A 'buy back' agreement with the bank
"(3)   A guarantee by Northwest Mortgage, Inc.
"(4)   A construction guarantee by Crown Life Insurance Co.

"The money is committed for a specified time and that the interest rate could not be obtained elsewhere. He suggested that the investment be carried on the books as a participation mortgage with Lakewood Way Apts., Inc. rather than Great Western Mortgage Company.

"Mr. Engelbert asked for any comments or questions from those present. Mr. Balsiger asked Mr. Galton if, in his opinion, the Trust was prudent to put all it's [sic] assets into one investment such as Great Western Mortgage Company. Mr. Galton stated the invest-

ment, in his opinion, was a prudent one and the Trustees should be commended for their judgment.

"Mr. Engelbert again asked if there were any comments or questions on this matter and Mr. Nibley stated he had done some research on the matter around the Seattle-Bellingham area where the subject property is located and that he was told there are six liens against the property. Mr. Galton stated that there is a first mortgage on the property with an A.T.A. policy guaranteeing the mortgage and that one should always be careful not to place confidence in rumors of liens."

Mr. Herrle testified that he was employed by a company that had administered these Trusts from their inception until the latter part of 1971. He testified that he was present throughout the entire meeting of May 11, 1971, in his capacity as employee of the administrator and that the accused was present and gave the trustees "his opinion" concerning the combining of the two trust funds. Mr. Herrle further testified that the trustees had some concern with respect to "depositing health and welfare funds into Great Western Mortgage. * * * So an explanation of it was given by Mr. Galton." The witness testified that the "explanation" was of the "workings of participation with" GWM. The witness swore that the trustees were then considering a specific investment in Lakeway Apartments in Washington. He testified that the accused made the statements attributed to him in the minutes.

Concerning the matter of whether the accused disclosed to the trustees his representation of GWM, Mr. Herrle testified:

"Q At the time of this meeting on May 11, 1971, did you have any knowledge about whether or not Mr. Galton might have represented Great Western Mortgage Company?

"A No.

"Q Did Mr. Galton make any statements at this meeting to the trustees about whether or not he had represented Great Western Mortgage Company?

"A   Not to my knowledge.

"Q   Well, were you present during the entire meeting?

"A   Yes, I was.

"Q   Were you present during the entire time that these two subjects were being discussed?

"A   Yes.

"Q   And you don't recall Mr. Galton making any such disclosure?

"A   No, I don't."

The same witness testified that his company had no independent authority to invest monies of the Trusts, but were told what investments to make by the trustees.

The accused testified that he had never performed legal services for the Trusts prior to the matter of the proposed merger and that he had never written any opinions for them with reference to any investment with GWM.  He explained his being at the May 11, 1971, meeting:

"A   I was requested by Mr. Engelbert, trustee of this trust fund, to appear and to discuss the merger of the Health and Welfare Trust Fund with the Dental Trust Fund; and also, Mr. Engelbert said, 'You knew, and you, the attorney for Great Western, certain investments had previously been made,' and he wanted me to explain to the trust the concept of Great Western."

His testimony continued:

"Q   Can you tell the Board whether or not you disclosed at the meeting that you were the attorney for Great Western Mortgage Company, or at least you had done some work for them?

"A   That is the first thing that I said, and I so made that representation.

"Q   Has there ever been throughout any of this time period, have you ever in anyway to anyone, attempted to not disclose or to keep secret, any work or the fact that you had done work for the Great Western Mortgage Company?

"A   No, sir."

The accused went on to agree that he made the state-ments attributed to him in the minutes quoted, *supra,* in item 4 down to, but not including, "(3) A guarantee by Northwest Mortgage, Inc."

While testifying as to the accuracy of the first part of the minutes under item 4, he interrupted to return to his claim of disclosure as follows:

"A   Yes, that is correct, but the minutes fail to reveal that the first thing I said that before I would speak on any investments that everybody should know that I—I think I used the term 'spasmodic attorney for Great Western.' And I made the disclo-sure open, referring again to Mr. Engelbert, who knew that fact. I thereupon made these statements attributed to me in these minutes, only as to those statements that you have said are so stated."

He denied that the minutes were accurate from the reference to Northwest Mortage, Inc., on and denied specifically making the rest of the statements attributed to him in the minutes under item 4; moreov-er, he denied ever hearing of Lakewood Apartments and denied recollection of any discussion whatsoever of liens.[6]

■■   It now becomes necessary for us to exercise our fact finding responsibility and to determine on the record before us what did take place at the meeting of May 11, 1971. In doing so we make our own independ-ent review of the evidence. *In re J. Kelley Farris,* 229 Or 209, 219, 367 P2d 387 (1961). We have in mind that

---

[6] The accused points out that apparently the trustees never acted in reliance upon whatever he said at the May 11, 1971, meeting. He rightly points to the evidence that the trustees had made substantial investments with GWM in the period from November 24, 1969, to as late as April 8, 1971, when they invested $238,500, and that the trustees did not again invest with GWM until some 21 months later in January, 1973. We are not dealing with a charge of fraud, however, and we do not believe the establishment of this charge of unethical conduct requires a showing of detrimental reliance. We do not understand that the accused really con-tends to the contrary. We really mention this only because the accused has drawn our attention to this evidence, and we desire that he understand we have noted it.

although the proceedings are neither civil nor criminal, but rather are sui generis, ORS 9.535(6), this court has followed the rule that the accused is entitled to the presumption that he is innocent of the charges made in disciplinary proceedings. *In re Alan Ruben,* 228 Or 5, 7, 363 P2d 773 (1961). Moreover, it is well established that the charges may be established only by evidence that is "clear and convincing." *In re J. Kelley Farris, supra,* 229 Or at 219.

We have been able to discern no reason from the record to doubt the testimony of Mr. Herrle as to what transpired. That testimony is buttressed by the minutes of the meeting,[7] and there is nothing in the record to imply that there was any reason to falsify the minutes. Neither is there anything which would indicate that the difference in the events described by the keeper of the minutes and that described by the accused is due to carelessness of the keeper. On the other hand, the record shows that the accused was a busy lawyer with numerous clients whose business often required the presence of the accused at meetings of the kind here involved. It is easy to understand how the details of this particular meeting could have escaped him in the seven and one-half years between the meeting in May, 1971, and the giving of his testimony in November, 1978. We do not attribute his testimony to falsification; we simply believe it to be inaccurate.

In summary we find that the accused did advise the Trusts that investment with GWM was safe and prudent in the particulars shown by the minutes quoted, *supra,* and that he did fail on this particular occasion to make clear to the trustees the nature of his relationship with GWM.

---

[7] The minutes of four meetings of these trustees are in evidence. Two sets were offered by the Bar and two by the accused. We are impressed by the fact that these minutes, in all four instances, are not just "action" minutes. Rather, they are quite detailed.

In disposing of the first, second and fourth charges, we assumed without deciding that the accused had an attorney-client relationship with GWM, because those charges were not established even assuming the relationship. We now turn to evidence that bears upon the accused's relationship with GWM for the time in question.

GWM commenced operating in Oregon in early 1969. The company employed the accused to examine and review all documents it proposed to use in implementing the plan of operation described near the outset of this opinion. Under date May 8, 1969, the accused rendered his written opinion:

> "After reviewing all documents in connection with the operation and mechanics as outlined under Great Western's plan of operation, it is my opinion that all of the legal requirements have been met as far as the needs of the Pension Trusts, Health & Welfare Trusts, and Local Union's Funds are concerned."

In November, 1969, a Seattle lawyer, who was on a first name basis with the accused, sought from the accused information concerning GWM to enable the lawyer to advise "a number of trusts" represented by the Seattle lawyer. The accused answered the inquiry by letter dated November 28, 1969:

> "Re:  Great Western Mortgage Corp.

> "Dear Tom:

> "With reference to your letter of November 25, 1969, in connection with the above named corporation, it is interesting that you ask us for our opinion, because we have represented Great Western for the past year. We have found them to be extremely trustworthy, unusually honest and capable and quite brilliant in their field of operations. Not only have they saved our local labor temple from bankruptcy, but also they are quite brilliant in the field of finances and investments. Furthermore, I work quite closely with them and have never found anything in anything that they have done that has caused me any concern. In brief, I

recommend them unqualifiedly, with the understanding that my bias has not interfered with my analytical conclusion herein."

The accused testified that the principals of GWM called him from time to time for advice from the inception of their relationship until the last legal work he did for them in late 1974. His own testimony quoted, *supra,* shows that he was aware that his relationship with GWM was that of attorney and client. It is true that he was not on a retainer and that GWM did employ other counsel from time to time, but there is nothing that prevents one from having an attorney-client relationship with more than one lawyer at a time. Neither must a lawyer be on retainer or engaged for a specific purpose to be considered an attorney for a client who, from time to time, calls that lawyer seeking legal advice and receives such advice as a matter of course. Oddly enough, the accused seems to have refused or failed to charge for the legal work he described as having performed for this client, except for a charge for specific litigation in 1973 and for one other time in late 1973 for a general claim for legal services. There is no record that he charged for, or was paid for, the many telephone calls or his initial work which culminated in the letter of May 8, 1969, quoted above.

Throughout his testimony when his attention was focused on whether he, at any given time, had the relationship of attorney-client with GWM, he tended to describe his representation of that client as "spasmodic," but when his attention was focused on whether he disclosed his relationship with GWM to other clients, he tended to describe it in words which gave the impression of an ongoing thing.

We are satisfied that the accused was in an ongoing relationship of attorney to client with GWM at the time of the May 11, 1971, meeting.

The Bar has not specifically cited us to any statute or rule governing professional conduct other than Canon 5 and Canon 9. The accused has not directed our attention to any other statute or rule. We believe the accused's position in his defense to this third charge is not that the conduct described is not unethical, but rather that he simply did not engage in the conduct described in the Bar's complaint. Nevertheless, it is incumbent upon us to identify the statute or rule which specifies that the conduct established by the evidence is proscribed.

We have recognized that professional ethics for members of the Bar are codified in ORS 9.460 to 9.580. *Sadler v. Oregon State Bar,* 275 Or 279, 294, 550 P2d 1218 (1976). More accurately they are codified in ORS 9.460, 9.480 and 9.500 to 9.520. There are additional provisions governing professional conduct. In 1935 the legislature provided by what is now codified ORS as 9.490:

> "The board of governors, with the approval of the state bar given at any regular or special meeting, shall formulate rules of professional conduct, and when such rules are adopted by the Supreme Court, shall have power to enforce the same. Such rules shall be binding upon all members of the bar."

Pursuant to that statute, "Rules of Professional Conduct of the Oregon State Bar" were adopted, and approved and became effective in December, 1935. Those were the rules which were in effect at the time with which this third charge is concerned.[8]

Rule 1 provides with respect to the Canons:

> "* * * The specification in these rules of certain conduct as unprofessional is not to be interpreted as an approval of conduct not specifically mentioned. In that connection, the Canons of Ethics of the American Bar Association are commended to the members of the state bar. * * *"

---

[8] The American Bar Association Code of Professional Responsibility had not yet been adopted on May 11, 1971.

There are other Rules which conceivably bear upon the conduct alleged in this third charge:

"Rule 5. A member of the state bar shall not accept employment adverse to a client or former client relating to a matter in reference to which he has obtained confidential information by reason of or in the course of his employment by such client or former client.

"Rule 6. A member of the state bar shall not accept professional employment without first disclosing his relations, if any, with the adverse party, and his interest, if any, in the subject matter of the employment.

"Rule 7. A member of the state bar shall not represent conflicting interests, except with the express consent of all parties concerned after a full disclosure of the facts, and then only when acting in the capacity of arbitrator. Within the meaning of this rule, a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which his duty to another client requires him to oppose. The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences also forbids the member from subsequently and knowingly accepting or continuing in employment by others in matters adversely affecting any interest of the client with respect to which confidence has been imposed.

"Rule 22. A member of the state bar shall preserve his client's confidence beyond his employment, and this duty extends as well to his employees. Neither thereof shall accept employment which in any degree involves the disclosure or use of such confidences, either for the private advantage of the lawyer or his employees or to the disadvantage of the client, without the knowledge and consent of such client, and even though there are other available sources of such information. He shall not continue employment when he discovers that this obligation prevents the performance of his full duty to his former or to his new client. This rule, of course, does not apply when a member of the state bar is falsely accused by his client, nor when the client announces his intention to commit a crime."

Those rules bear generally on the matters of conflict of interests and maintaining the confidences of clients.

Relevant also are some statutory provisions:

ORS 9.460(5): "An attorney shall: Maintain inviolate the confidence, and at every peril to himself, preserve the secrets of his clients."

ORS 9.480: "The Supreme Court may disbar, suspend or reprimand a member of the bar whenever, upon proper proceedings for that purpose, it appears to the court that:

"(1)  He has committed an act or carried on a course of conduct of such a nature that, if he were applying for admission to the bar, his application should be denied; or

"* * * * *

"(4)  He is guilty of willful deceit or misconduct in his profession; or

"(5)  He is guilty of willful violation of any of the provisions of ORS 9.460 * * *."

Assuming that the Canons of Ethics are applicable, we find those cited to us provide:

"Canon 5:  A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client.

"Canon 9:  A Lawyer Should Avoid Even the Appearance of Professional Impropriety."

As to the specific charges in this third cause of the Bar's complaint, we find that the accused without revealing his relationship with GWM did advise his client, the Trusts, that investments with his client, GWM, were safe and prudent and that such conduct was a violation of Rules 6 and 7, Rules of Professional Conduct of the Oregon State Bar. Since we find that conduct to be a violation of Rules 6 and 7, we do not reach whether other rules may have been violated. We find that the accused's dual representation of these clients did not result in his using any confidential information gained from one client for the advantage of himself or the other client. We find that the accused's conduct did place him in a position where his

professional judgment for his client, the Trusts, could not be exercised free of compromising interests and loyalties. This conduct was a violation of Canon 5 and of at least the spirit of Rule 7, Rules of Professional Conduct of the Oregon State Bar. We find that the accused is not guilty by this conduct of depriving the Trusts of an opportunity to secure independent advice. The Trusts did not invest in Lakewood Apartments insofar as the record discloses and made no investment with GWM until 20 months after receiving the accused's advice.

There remains the matter of the charge that the accused's concurrent representation placed him in a position which could result in an appearance of impropriety. We are not sure that the language chosen for the complaint charges any violation of Canon 9. In any event, it is unnecessary to reach that question or whether there was any appearance of impropriety. If there were such an appearance, it would not add to the severity of discipline in the circumstances of this case.

The Bar's complaint alleges that this conduct on the part of the accused was willful misconduct in his profession. *See,* ORS 9.480(4). We agree; therefore under ORS 9.480 we hereby reprimand the accused.

Accused reprimanded by these presents. The Oregon State Bar shall recover of and from the accused its costs and disbursements incurred in these proceedings.