Argued and submitted September 6, accused suspended September 18, 1984

In re Complaint as to the Conduct of
# KENNETH A. MORROW,
*Accused.*

(OSB 82-100; SC S30428)

688 P2d 820

Edward T. Monks, Eugene, argued the cause for the accused. On the brief was Kenneth A. Morrow, *pro se.*

David B. Knower, Albany, argued the cause for the Oregon State Bar. With him on the brief was James G. Nelson, Albany.

## PER CURIAM

The accused is charged with violation of certain disciplinary rules contained in the Code of Professional Responsibility and with being subject to sanction by this court for conduct described in former ORS 9.480(4), which is now ORS 9.527(4). The Oregon State Bar's complaint is in two causes, both charging misconduct in connection with the accused's attorney-client relationship with one Poling.

The first cause charges that in July, 1977, the accused undertook to represent Poling against Russell Brooks in connection with a claim for damages for personal injuries on which the statute of limitations would run on May 25, 1979; that prior to that date the accused falsely led Poling to believe that the case had been filed and that settlement negotiations were taking place; that the cause was not filed timely; that from May 25, 1979, to September, 1981, the accused continued to mislead Poling to believe that the case had been timely filed and that settlement negotiations were proceeding; that Poling learned in September, 1981, that the case had not been filed, retained other counsel and sued the accused for malpractice, and eventually settled that case for $7,000. The Bar charged that the accused's conduct offended DR 6-101(A)(3) and DR 7-101(A)(1) and (2).

"DR 6-101    Failing to Act Competently.

  "(A)   A lawyer shall not:

    "* * * * *

    "(3)   Neglect a legal matter entrusted to him."

"DR 7-101    Representing a Client Zealously.

  "(A)   A lawyer shall not intentionally:

    "(1)   Fail to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules * * *.

    "(2)   Fail to carry out a contract of employment entered into with a client for professional services * * *."

In the second cause the Bar charged that in the particulars described in the first cause the accused had engaged in conduct involving dishonesty, fraud, deceit or misrepresentation; had knowingly made false statements of

fact; and had engaged in wilful deceit or misconduct in the legal profession. The Bar charged that such conduct offended DR 1-102(A)(4), DR 7-102(A)(5) and former ORS 9.480(4).

"DR 1-102    Misconduct.

"(A)    A lawyer shall not:

"* * * * *

"(4)    Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

"DR 7-102    Representing a Client Within the Bounds of Law.

"(A)    In his representation of a client, a lawyer shall not:

"* * * * *

"(5)    Knowingly make a false statement of law or fact."

Former ORS 9.480 provided:

"The Supreme Court may disbar, suspend or reprimand a member of the bar whenever, upon proper proceedings for that purpose, it appears to the court that:

"* * * * *

"(4)    The member is guilty of wilful deceit or misconduct in the legal profession."

By his answer to the complaint the accused admitted undertaking to represent Poling, failing to file a cause by May 25, 1979, and settling Poling's malpractice claim against the accused. He denied the allegations of misleading Poling both before and after May 25, 1979. He admitted the allegation: "Accused neglected a legal matter entrusted to him," but denied that he had thereby violated a disciplinary rule. He denied that he had intentionally failed to seek the lawful objectives of his client and that he intentionally failed to carry out his contract of employment.

Our independent review of the record, together with allegations admitted by the accused, discloses the following facts.

1.    The accused is an attorney admitted to practice in Oregon, having his office and principal place of business in Lane County.

2.   On May 25, 1977, George Poling was a deputy sheriff of Lane County and at that time and place attempted to issue a citation to Russell Brooks for a traffic infraction. Brooks refused to accept the citation and attempted to leave Poling's presence. Poling then attempted to arrest Brooks, and an embroglio ensued with some friends or relatives of Brooks coming to his aid and Poling being assisted by another police officer, Robert Rutherford. Both police officers were injured.

3.   Criminal charges were brought against Brooks for resisting arrest and assault on the police officers.

4.   Poling consulted an attorney in Eugene, who referred Poling to the accused for assistance in prosecuting a claim for damages for personal injuries against Brooks.

5.   In July, 1977, Poling consulted the accused in the accused's office, and the accused agreed to represent him in the matter.

6.   For tactical reasons, the accused did not want to file a case against Brooks until after disposition of the criminal charges. The criminal case was tried in January, 1978, and Brooks was convicted of assault on the officers and of resisting arrest.

7.   After the initial consultation with the accused in July, 1977, Poling did not see the accused again until May 12, 1978, when he went to the accused's office, discussed the case, and signed a "pleading back" in blank with the understanding that a complaint would be prepared later and the back attached to it for filing. The accused also signed the back on the line reserved for the signature of a notary public, but he did not affix his notarial seal.[1]

8.   On that date, May 12, 1978, Poling was aware that the deadline for filing his case within the period of the statute of limitations was May 25, 1979.

---

[1] No charge of unethical conduct was made by the Bar with respect to this matter, probably because the accused did not affix his notarial seal and the back was never used as contemplated. This is a dangerous practice and could lead to an attorney being subject to disciplinary proceedings. A lawyer can hardly ethically ask a client to swear to the truth of allegations not yet formulated. *Compare, In re Kraus,* 289 Or 661, 616 P2d 1173 (1980); *In re Evelyn N. Scott,* 255 Or 77, 464 P2d 318 (1970); *In re Monte E. Walter,* 247 Or 13, 427 P2d 96 (1967).

9. On August 2, 1978, Peggy Brewer, a member of a family the accused had represented on matters in the past, was seriously injured in a vehicle accident. A relative of Peggy Brewer approached the accused to represent her, and he undertook her representation. One of the accused's associates, to whom he referred the case for investigation, informed the accused that the driver responsible for her injuries appeared to be a man named Russell Brooks, who was driving a vehicle similar to that driven by the person who had injured Poling.

10. Investigation indicated that the driver who had injured Brewer had insurance limits of only $100,000, and the accused believed that her injuries were so severe that she would recover judgment in excess of that amount and would have to look to the driver's personal estate to satisfy the excess.

11. The accused was aware that because he contemplated for Poling a cause of action for battery against Russell Brooks, there would be no liability insurance available for Brooks to pay Poling's damages if he were successful in the prosecution of his claim.

12. The accused wanted to investigate further to determine if the same Russell Brooks was involved in both cases, for, if so, the accused perceived a conflict that he believed would necessitate his referring Poling to another lawyer.[2]

13. The accused procrastinated in determining whether the same Russell Brooks was involved. He could have quickly discovered from his own files that the same Russell Brooks was not involved in each case.

14. Although the accused was aware that Poling was considering having plastic surgery for the injuries inflicted by Brooks, the accused at no time procured any reports from Poling's treating doctor.

---

[2] This never happened, but because the accused had undertaken to represent Poling before he undertook to represent Brewer, it would appear at first blush that had a conflict actually occurred, the accused's duty would have been to refer Brewer elsewhere. The accused did represent Brewer and recovered judgment for her in excess of $100,000. *See* Canon 5 and accompanying disciplinary rules in the Code of Professional Responsibility.

15. The accused had discussed with Poling the amount of damages to be alleged in a complaint and had made notes indicating that $1,000 general damages and $7,500-10,000 punitive damages would be sought.

16. The accused sent no communication to Brooks to advise him that the accused represented Poling and to initiate any kind of settlement negotiations. Despite the fact that the accused intended to submit a prayer for punitive damages on Poling's behalf, the accused made no investigation of Brooks' assets or wealth.[3]

17. The accused saw Poling on "many" occasions during the period from July, 1977, to May 25, 1979, at places outside the accused's office and was thereby reminded of the case on those occasions.

18. The accused had no "tickler" system of any kind to remind him to file the case by May 25, 1979.

19. As May 25, 1979, approached, the accused had an extremely busy trial schedule, and the presiding judge of the court where the cases were pending required the accused to try one case right after another over a period of several weeks; in fact, the accused was scheduled for overlapping trials at the time the statute of limitations ran.

20. The accused failed to commence the action for Poling within the time limit, i.e., May 25, 1979.

21. When, after May 25, 1979, Poling inquired as to the status of his case, the accused deliberately failed to advise Poling that the accused had failed timely to file the case.

22. The accused then led Poling to believe that the claim against Brooks could still be prosecuted by telling Poling that he didn't have to worry any more about liability because the only unsettled question was the amount that Poling should receive in settlement.

23. The accused asked Poling what he thought he should net from settlement, and Poling eventually told the accused that he wanted $1,500. The accused told him he would get it, intending to pay that amount to Poling out of the

---

[3] He did testify that his method in this kind of case would be to file the case and start investigation of the defendant's wealth through the use of a discovery deposition.

accused's personal funds although he knew that Poling thought that the funds would come from Brooks.

24. The accused did not go through with the scenario that he had thus scripted because he realized that it would not be fair to Poling in that Poling should have the advice of his lawyer as to the value of his claim and because the accused believed that the value of a malpractice claim against him would have more value on a practical basis than Poling's original claim against Brooks had.

25. The accused did not advise Poling that the case had not been timely filed and did not advise Poling to seek independent counsel.

26. Eventually, Poling discovered independently that the case had never been filed, and he consulted another lawyer. That lawyer, in due course, filed a case against the accused for malpractice, and the accused eventually settled the claim for $7,500, which he paid from his personal funds.

The major dispute in the evidence in this proceeding was whether prior to May 25, 1979, the accused had informed Poling and his wife that the case had been filed. Poling testified that the accused in early 1979, before May, in a chance encounter at the courthouse had told him that the case had been filed. Poling's wife, who worked at the courthouse, testified that a month or two before May 25, 1979, she encountered the accused at the courthouse and asked him if the case had been filed. She testified that he told her it had been filed. The accused denied that he ever told either of them prior to May 25, 1979, that the case had been filed.

The Trial Board found that the accused, during the period from July, 1977, to May 25, 1979, had led Poling and his wife to believe that a complaint had been filed for Poling, when in fact it had not. The Trial Board found that after May 25, 1979, the accused, by implication, led Poling to believe that settlement negotiations were taking place to settle Poling's claim against Russell Brooks. The Trial Board further found that the accused implied to Poling that the claim had been settled for $1,500. The Trial Board found that the accused had let the statute of limitations run without filing the cause and had failed to advise Poling of that fact. The Trial Board further found that the accused never advised Poling that he

had a cause of action against the accused and that the accused never advised Poling to retain other counsel to represent him against the accused.

The Trial Board found that the accused's conduct was in violation of DR 1-102(A)(4), DR 6-101(A)(3), DR 7-102(A)(5) and former ORS 9.480. The Trial Board recommended that the accused be suspended from the practice of law for a period of six months and placed on probation for two years.

The Disciplinary Review Board found that the accused had delayed commencing Poling's case against Brooks to await the outcome of Brooks' criminal prosecution and that this was a reasonable act in the circumstances. The Board also noted that the accused had further delayed to resolve the possible conflict between the interests of Poling and those of Brewer. That Board made essentially the same findings as we have made and as the Trial Board made, as summarized, *supra*. The Disciplinary Review Board did not make any specific finding that the accused had, or had not, misled Poling prior to May 25, 1979, about the filing of the case.

The Disciplinary Review Board found that the accused had engaged in deceit and misrepresentation in violation of DR 1-102(A)(4) and former ORS 9.480(4). The Board held that DR 7-102(A)(5)

> "pertains to knowingly making a false statement of law or fact in connection with 'representing a client within the bounds of the law' and, as such, does not relate to the relationship with the attorney and client, but rather with the attorney and third persons, including courts and other tribunals."

The Disciplinary Review Board found that despite the accused's admission in his answer that "Accused neglected a legal matter entrusted to him," his conduct in failing to file the cause within the time allowed by law was due to his belief that filing should await the outcome of the criminal prosecution against Brooks and later his desire to resolve the possible conflict before proceeding with Poling's case. The Board found that the failure to file timely was "ordinary negligence" and because this court held in *In re Robert Neil Gygi,* 273 Or 443, 541 P2d 1392 (1975), that isolated instances of ordinary

negligence do not warrant discipline under that rule, the accused was not guilty.

The Disciplinary Review Board recommended that the accused be suspended from the practice of law for a period of 60 days.

We shall first resolve the question of fact as to whether the accused prior to May 25, 1979, told Poling or his wife that the case had been filed. As noted above, both of them so testified, and the accused firmly denied that their testimony was accurate.

There is uncontradicted evidence that Brooks filed a civil action for damages arising out of the above-described embroglio against Lane County, Poling and Rutherford. That case was filed on May 24, 1979, and Poling was served with summons after May 25, 1979. Poling testified that when he went to the lawyers whom the county selected to defend that case, he told the lawyers

> "[M]y intention was to file a lawsuit against Mr. Brooks as a result of the injuries I sustained."

He testified that this was the day he went to the defense lawyers' office to give his deposition. We infer that that date was surely some time after May 25, 1979. It does not appear reasonable to us that if the accused had told Poling before May 25, 1979, that the case had been filed, Poling after that date would speak to his intention to file.

The Bar is required to establish its case by clear and convincing evidence, *In re Galton,* 289 Or 565, 579, 615 P2d 317 (1980), and we are unable to find from this evidentiary record that the Bar has established that it is "highly probable" the accused misled Poling and his wife prior to May 25, 1979. *See Cook v. Michael,* 214 Or 513, 527, 330 P2d 1026 (1958), for the proposition

> " 'clear and convincing evidence' means that the truth of the facts asserted is highly probable."

We do not regard this as a choice as to deciding whether the accused's testimony or that of the Polings is accurate; we simply cannot say which is accurate. That means we cannot find the fact to be established.

The accused in argument in this court pointed out

that although he admitted in so many words that he had neglected a matter entrusted to him, he had denied that he had violated DR 6-101(A)(3). The Bar argues that because the words of his admission are taken from the text of the disciplinary rule, he cannot deny violation of the rule. We find it unnecessary to decide that matter because we disagree with the Disciplinary Review Board. This is a classic case of neglect of a legal matter. The client retained the lawyer to prosecute this claim 22 months before the statute of limitations would bar the claim. We accept that the accused may have had good tactical reasons for delaying prosecution until after the disposition of the criminal charges against Brooks, but that was finished in January, 1978. The accused did virtually nothing to prosecute this claim in the ensuing 16 months. The mere fact that he was under pressure at the end of that period to try cases one after the other cannot excuse the failure to attend to this matter in the many months beforehand.

We find that the accused is guilty of violation of DR 6-101(A)(3).

We conclude that it is unnecessary for us to decide whether DR 7-102(A)(5) applies to this situation. The Bar relies upon exactly the same conduct by the accused to prove violation under that rule as under DR 1-102(A)(4) and former ORS 9.480(4), both of which the accused concedes he has violated by his conduct in misleading his client after the time for filing the case had expired. We agree with the Bar and with the accused that he violated the latter rule and the statute.

There remains the matter of discipline. The accused has placed in the record evidence to show that he has been active in a very positive way both in the Bar and in other civic settings. We believe that evidence. The accused placed in the record evidence to show his misconduct has already been widely publicized in the area where he practices. He argues that he should be given credit "for time served" in that respect. We have noted before that probably every disciplinary proceeding has such consequences for the lawyer involved. *See, e.g., In re Houchin,* 290 Or 433, 439, 622 P2d 723 (1981), and cases cited therein. Insofar as time served is concerned, the Bar points out that when a lawyer violates the Code of Professional Conduct, he causes others to "serve time" also. The lawyers who prosecute the Bar's case, the members of the

Trial Board and the members of the Disciplinary Review Board toil without compensation because of an accused's violations.

Both the Bar and the accused have cited to us those cases they believe to be of assistance in connection with the proper sanction for the kind of misconduct involved here. The Bar cites *In re Hill,* 296 Or 622, 678 P2d 1218 (1984); *In re Fuller,* 284 Or 273, 586 P2d 1111 (1978); *In re Berg,* 276 Or 383, 554 P2d 509 (1976); *In re Ronald L. Ricketts,* 249 Or 575, 439 P2d 873 (1968); and *In re C.E. Wheelock,* 233 Or 236, 377 P2d 858 (1963). We shall discuss these cases in chronological order.

In *Wheelock,* the lawyer dealt with a troublesome client in a probate matter. The client insisted that a certain asset of the estate should be sold for $12,000, of which the client expected one-third. To placate the client the lawyer lied to her about work he claimed to have performed and was going to perform to carry out her desires and fulfill her expectations. Eventually, he pretended that the property had been sold for $12,000 and out of his own pocket paid her what she would have received had his falsehoods to her been true. This court issued a public reprimand.[4]

In *Ricketts* the lawyer likewise dealt with an unreasonable client. To deal with the demands of the client the lawyer falsely represented that he had filed a claim for the client, fabricated details of the prosecution of the nonexistent pending claim and finally forged a false document purporting to be an order of the court disposing of the claim adversely to the client's interest. This court was satisfied from the record that the claim had been worthless in any event so the client had not been harmed. This court, as in the second *Wheelock* case, fn 4, *supra,* found that the lawyer suffered psychiatric problems that caused his misconduct. In the circumstances, the court found a two-year probation to be appropriate, without other sanction.

---

[4] Unfortunately, Mr. Wheelock engaged in misconduct of substantially the same character later, but it was shown to this court's satisfaction that his misdeeds resulted from mental and emotional disorders, and we found that because he had undergone successful psychiatric treatment for those disorders, two years' probation rather than reprimand or suspension was indicated. *In re C.E. Wheelock,* 249 Or 572, 439 P2d 872 (1968).

In *Berg* this court summarized the misconduct as follows:

> "The charges involved generally gross procrastination and neglect in handling the legal affairs entrusted to him by his clients, but, more seriously, with representing to the clients that he was taking care of their affairs when such representations were patently false. In some instances he permitted the statute of limitations to run against his clients' claims, did not inform those clients that the claims were barred, but still assured his clients that their claims were receiving his attention and would be settled or tried.

> "In one or more instances he informed his clients that he had filed actions on their claims when, in fact, he had not done so. He personally paid one client $1,500 in settlement of her malpractice claim against him and his insurance company paid $3,500 to settle the claim of another client."

276 Or at 385. The charges are similar to the case at bar, but there were five charges rather than two as in this case. The lawyer was suspended for one year.

In *Fuller* the lawyer was retained to file a cause in trespass. He did not do so. The misrepresentation by the lawyer was much as in the case at bar. He allowed his clients to believe that an action had been filed and that he had taken a default judgment in the clients' favor. He then negotiated with the adverse party's counsel for settlement and obtained an offer that was rejected by the lawyer's clients. They instructed him to collect on the judgment. He then accepted a settlement offer without authority from the clients, who by then thought the case was to be tried. It was not until they appeared at the courthouse for trial that they learned the true state of affairs. This court both publicly reprimanded the lawyer and suspended him for 60 days.

In *Hill* the lawyer falsely informed his client that an appeal had been taken, failed to take appropriate post-trial actions for the protection of the client's interest, failed to keep the client informed of the matters that were actually taking place, lied to a third party to secure endorsement of a check, and refused to disburse conservatorship funds as ordered by the circuit court. We disbarred that lawyer.

The instant accused draws our attention to *In re Zumwalt,* 296 Or 631, 678 P2d 1207 (1984); *In re Houchin,*

*supra; In re Miller,* 287 Or 621, 601 P2d 789 (1979); and *In re Ronald L. Ricketts,* discussed *supra.*

In *Zumwalt* the lawyer retained for several months double payment of a settlement amount, refusing for some time to return it even after justified demand for return. It appeared that the lawyer was inexperienced and had a personality conflict with opposing counsel that sparked in the accused a desire to make him suffer somewhat. We said:

> "It is apparent from the record in this case that the accused was driven to her misdeeds by anger and frustration, neither of which emotional response justifies her action. But we are mindful that the purpose of the sanction is the protection of the public and that the punishment of the accused is only incidental."

296 Or at 637. We followed the recommendation of the Bar, the Trial Board and the Disciplinary Review Board in administering nothing more than a public reprimand.

In *Houchin* the lawyer enrolled in a community college course as a student while employed as a teacher for such a course. He did it to avoid reduction of veteran's benefits he was receiving as a student. We found the conduct was in violation of DR 1-102(A)(4) and former ORS 9.480(4) and suspended him for 30 days.

In *Miller* the lawyer took advantage of clients whom he was appointed to represent in criminal matters by obtaining bail deposits, resulting in his being paid fees higher than he would have received otherwise without the clients' understanding of what happened. We "reluctantly" complied with the recommendations of the Trial Board and the Disciplinary Review Board that a public reprimand rather than suspension was the proper sanction.

It is readily apparent that the Bar has cited to us cases that it believes to be close on the kind of misconduct involved. The accused has cited cases involving a lawyer playing fast and loose with someone's money for the purpose of reminding us of what might appear to be relatively light sanctions. We have all of the decisions cited to us in mind and have determined that the case closest in point is *Fuller* where we ordered a 60 day suspension. We believe the purpose of sanction will be served in this case by suspending the accused

from the practice of law for a period of 60 days to commence October 1, 1984, and end November 29, 1984.

It is ordered that the accused be suspended from the practice of law for a period of 60 days, commencing October 1, 1984, and ending at midnight November 29, 1984, unless a petition for rehearing is filed on or before September 26, 1984. The Oregon State Bar shall have judgment against the accused for its actual and necessary costs and disbursements incurred in this matter.