Submitted on record June 11, accused reprimanded October 23, 1979

In re Complaint as to the Conduct of
JOHN R. MILLER,
*Accused.*

(No. 1339, SC 26188)

601 P2d 789

No appearances.

PER CURIAM.

**PER CURIAM**

The accused attorney, John R. Miller, was charged with three counts of unethical conduct in his representation of two individuals in criminal proceedings against them. This matter comes to this court following a trial before a Trial Board and review by the Disciplinary Review Board.

### THE FIRST COUNT

The first charge arose incident to Miller's representation of Rodney Wilkins, an indigent, in a criminal case. Miller had been appointed by the Circuit Court for Marion County. Following his appointment, Miller and Wilkins met and discussed the case. Among the matters they discussed was the procedure by which Miller would cease to be a court-appointed attorney and would become a "retained attorney."

The transition from a court-appointed attorney to a retained attorney was accomplished in the following manner:

Following his court appointment Miller met with Wilkins and asked Wilkins to sign a document entitled "Assignment of Bail," which read:

"For good and valuable consideration, the receipt of which is hereby acknowledged, I assign, set over and release to John R. Miller, Attorney at Law, 211 Lancaster Mall, 831 Lancaster Drive N.E., Salem, Oregon 97301, the amount of bail which I have posted, less the statutory retainer."

Miller testified:

"A    Okay. I talked with him I believe in the Marion County Jail regarding that. I took down some information from him regarding his—regarding the case and showed him the assignment of bail form indicating that this would enable bail posted to be applied to my attorney's fees for representing him in the case. He was advised that this would make me a privately retained attorney for him and at that time would be billed based on a

> $50.00 an hourly [sic] rate and the amount of his bill would be based upon the total amount of time expended in the case. I asked him if he had any questions and he did not and proceeded to execute the assignment of bail."

At that time, the rules of the Circuit Court of Marion County provided that the security deposit would be returned to the defendant through his attorney, apparently without regard to who had posted the security deposit.[1] Before its return to the defendant, these items were to be deducted: court costs, fines, and "attorneys fees where a court appointed attorney was involved in the case." Notice of this procedure was posted on the wall at the jail and on a form which the person posting the security deposit was required to fill out when posting security by check.[2]

---

[1] This policy had been announced in a letter to Marion County attorneys signed by Presiding Circuit Judge Val Sloper and Marion County District Attorney Gary Gortmaker and dated July 11, 1974. The letter, introduced into evidence, stated in part:

"Monies deposited as security for the appearance of defendants in Circuit Court will be returned to the defendant in care of his attorney's Post Office address after the deductions of:

"1. The statutory Clerk's cost which is 10% of the amount of the security deposit (not less than $5.00 nor more than $100.00);

"2. Any fine imposed in the criminal case which remains unpaid; and

"3. Attorneys' fees where a court appointed attorney was involved in the case.

"* * * * *.

"Only in unusual cases will the District Attorney's Office or Clerk's Office make return of bail directly to any defendant or his assignee."

[2] Both notices contained the following language:

*IMPORTANT NOTICE*
"YOU ARE HEREBY GIVEN NOTICE THAT ANY MONEY YOU POST FOR BAIL FOR THE ABOVE DEFENDANT WILL BE RETURNED TO *HIM* AND NOT TO YOU.

"BEFORE THE BAIL IS RETURNED TO THE DEFENDANT, ALL FINES, COSTS AND ATTORNEY FEES HE OWES THE COURT WILL BE *TAKEN OUT OF THE BAIL MONEY.*

"IT WILL BE *YOUR* RESPONSIBILITY TO GET ANY BAIL MONEY BACK FROM THE DEFENDANT." (Emphasis in original.)

At his client's request, Miller asked Wilkins' mother, Darlene Griebel, whether she intended to post the $500 bail required to secure her son's release from jail.

The testimony was conflicting as to disclosures made by Miller. Mrs. Griebel testified:

"A  Mr. Miller came over and talked to Rodney and came back to me again and I said 'How much will the bail be?' And he said, '$500.00.' And I said 'Do you get any of it back?' And he said, 'All but ten percent, are you going to bail him out?' And I said, 'I'll have to make a few phone calls because I'll have to borrow the money.'

"* * * * *.

"Q  What did you do after that?

"A  Then I called and made arrangements to borrow the money, called Mr. Miller on the phone. * * * [A]lso I called Mr. Miller back before I left for Portland * * *.

"* * * * *.

"Q  And was there anything else discussed in that telephone conversation with Mr. Miller?

"A  No, not right off. Right now except that he said that I would get it back—oh, I also said to him—excuse me, I said, 'I don't want the money when it's returned, to be refunded—I didn't want it given to my son, Rodney.' He said, 'No, it will be given to the person that posted bail' —Nancy Holt [Mrs. Griebel's sister]."

"* * * * *.

"Q  All right. And are you quite certain in your own mind that he indicated to you that the bail would be returned to the person who posted the bail?

"A  Definitely.

"Q  It was not your understanding that it would be returned to your son in care of Mr. Miller?

"A  No, I asked him this on the last conversation on the phone. I said, 'It won't be returned to Rodney, will it? I don't want it to be.' And he

[625]

said, 'No, it wouldn't.' That stands out very clearly in my mind."

Mrs. Griebel also testified that she understood that Miller was a court-appointed attorney who would be paid by the court. Miller, however, testified that although he could not remember the exact words of the conversation, he was sure that he had explained the situation to Mrs. Griebel. He testified:

"A   Okay. That was still in open Court—it was still whispering and I informed her what the trial date was that had been set down by the Judge and likely inquired further as to whether or not she was going to post bail. I don't really recall very well what the sum and substance of that conversation was of what was said. It's my standard policy whenever anyone inquires about bail to tell them what basically the rules were at the time and that was that from any bail that was posted ten percent would be deducted and any fines or costs would be deducted and further that any attorney fees involved in the case would also be deducted prior to the bail being returned to the Defendant in care of his attorney.

"* * * * *.

"Q   Do you recall at any point and time indicating to her that the bail would in fact not be returned to the Defendant but be returned to the person who posted the bail?

"A   No, I do not recall that and cannot conceive of having made that statement in view of the Court rule.

"* * * * *.

"Q   Okay. In any event it's correct, isn't it, that at the time did you advise Mrs. Gibbel [sic] or Mrs. Holt that you had obtained such an assignment of bail from Rodney Wilkens? [sic]

"A   No, I didn't * * *."

Miller advised Mrs. Griebel to have the $500 delivered to his office and that he would post the bail on her behalf. He explained that he believed this

would expedite the release of Wilkins. The predictable consequence of this advice was that Mrs. Griebel would not learn of the bail refund procedure by reading the notice in the jail. In actuality, Mrs. Griebel's sister delivered the money to Miller at his office and then preceded him to the jail. She did not see the posted notice. Mrs. Griebel did not learn of the court rule providing for the return of the bail to her son or of its assignment to Miller until she received a bill mistakenly addressed to her indicating that Miller had applied the security deposit to his fee and claimed a balance owed for attorney fees above the amount of security she had posted. At that time she filed a complaint with the Oregon State Bar.

## THE SECOND COUNT

The second count of the Bar's complaint alleges that Miller acted unethically in his representation of Gregory Scheller, an indigent, in another criminal matter. Miller was initially appointed by the District Court for Marion County. Miller's testimony was that in their first interview he obtained an assignment of bail and Scheller's agreement that Miller serve as retained counsel for Scheller. Miller testified that he and Scheller first briefly discussed the charges against Scheller and that Miller then showed Scheller an assignment of bail form and explained how the execution of the assignment would result in Miller's becoming a "retained attorney."

Scheller's recollection was different. He testified:

"THE WITNESS: He told me his name and stuff and shook my hand and he said he was defending me and he told me to write down my signature, that he's defending me and I didn't bother looking at it, I just signed it. I was all nervous from the Judge raising my bail and stuff. I didn't bother reading it or anything."

Scheller also stated that his first knowledge that Miller was not his court-appointed lawyer was when he received a bill after pleading guilty to the criminal charges. Scheller believed that "the State would take

out a little bit" of the bail money, which had been
posted by relatives.[3]

## DISCUSSION

The Disciplinary Review Board found that Miller,
in each case, "failed to advise the parties depositing
the bail that the monies would be returned to the
defendants and not to them." The Disciplinary Review
Board further found that Miller "failed to advise the
parties depositing bail that he had converted the
status from that of a court-appointed attorney to one
appearing on behalf of the defendants for a fee, which
fee, of course, would be payable only from the bail
deposited."

We are convinced that Miller's principal motive in
having Wilkins and Scheller sign the assignment of
bail forms was to obtain a larger fee than he would
obtain as a court-appointed lawyer. He testified:

"Q   Well, isn't it true that at this time whenever you
had a Court appointed case either Circuit Court
or District Court, that it was your customary
practice to try to convert that case from a Court
appointed case to a retained case by obtaining an

---

[3] The third count alleged that Miller's cumulative acts as alleged in
counts one and two were detrimental to the integrity of the legal profes-
sion, that his conduct made Miller unfit to practice law in this state and
would require a denial of his admission to the Oregon State Bar if he were
then applying for admission. We do not find it necessary to otherwise
discuss this count.

ORS 9.480 provides:

"The Supreme Court may disbar, suspend or reprimand a member
of the bar whenever, upon proper proceedings for that purpose, it
appears to the court that:

"(1) He has committed an act or carried on a course of conduct of
such nature that, if he were applying for admission to the bar, his
application should be denied; or

"* * * * *.

"(4) He is guilty of wilful deceit or misconduct in his profession
* * *.

"* * * * *."

assignment of any bail that might have been posted by the Defendant or on his behalf?

"A   Ordinarily I would inquire of a person if bail had been posted or was going to be posted, if they would be willing to execute an assignment of bail so that I could be paid out of it * * *."

Nothing in the posted notice or letter from the court (see footnotes 1 and 2, *supra)* suggests that the court was encouraging indigent defendants to sign such forms. It appears that the court was simply implementing ORS 135.265(2).[4]

We conclude that the evidence is sufficient to support a finding that Miller violated DR 1-102(A)(4).

Disciplinary Rule 1-102(A)(4) provides:

"A lawyer shall not [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

Honesty can and often does require more than disclosure of the bare elements of truth. Even assuming that Miller informed Mrs. Griebel that attorney fees would be deducted from the security deposit before it was returned (as he testified he did), this explanation did not accurately disclose the complete truth—that the attorney fees deducted were not the court-appointed attorney fees deducted by the court, as the court rule stated, but the attorney fees to which Miller was entitled as a retained attorney and which he would deduct from the bail money returned to his client. We stated in *In re John W. Pennington,* 220 Or 343, 347-48, 348 P2d 774 (1960):

"* * * True, the rules of professional conduct may fill many pages; the opinions interpreting some of the

---

[4] ORS 135.265(2) provides:

"* * * When conditions of the release agreement have been performed and the defendant has been discharged from all obligations in the cause, the clerk of the court shall return *to the accused, unless the court orders otherwise,* 90 percent of the sum which has been deposited and shall retain as security release costs 10 percent of the amount deposited. * * * At the request of the defendant the court may order whatever amount is repayable to defendant from such security amount to be paid to defendant's attorney of record." (Emphasis added.)

rules, many volumes. But in the more basic conduct he is called upon to perform, any lawyer knows the simple rules that he must cling to: Simple straightforward honesty and absolute good faith. No less will suffice. Any person fit to be a member of the profession well knows when he has deviated from his obligations. Further exposition of his hard core of the lawyer duty would be pure embellishment."

The Trial Board, which heard the testimony of Miller, Mrs. Griebel, and her sister, determined that Miller did not intentionally mislead Mrs. Griebel but, rather, simply failed to advise her when he had an obligation to do so. An examination of the record leads us to question whether Miller could fail to advise Mrs. Griebel so completely absent an intention to mislead her.

Quite frankly, we also find it difficult to believe that any criminal defendant, if a full explanation were given, would ever sign such an assignment of bail form. As an indigent, the defendant would be entitled to either free legal services or, if defendant posted a security deposit, legal services at a minimal cost. By signing the assignment form, according to Miller's testimony, the defendant became liable for Miller's fee. But for the assignment of bail, Miller's fee would have been the customary fee for a court-appointed attorney, $50, unless he filed an affidavit with the court asking for an "extraordinary fee."

The record supports the conclusion that Miller's purpose in obtaining an assignment of bail was to benefit personally by receiving a larger fee. In fairness to Miller, we should point out that he testified that "every Judge at one time or another and the district attorney's office" encouraged attorneys to seek bail assignments when bail was posted for indigent clients, so that the clients themselves, rather than the courts, became obligated to compensate the attorneys.

There is no excuse for Miller's failure to make full disclosures to Mrs. Griebel and Gregory Scheller of his

interest in his respective dealings with each of them. That a court rule required the return of security deposited on behalf of an accused to his attorney in no way lessened his responsibility to be honest and forthright with a person who specifically questioned him about the return of bail proceeds.[5]

The Disciplinary Review Board found:

> "The accused had been admitted to practice approximately two years prior to the above mentioned appointments, but had not engaged in full time practice until about three months prior to the happening of these events. He also apparently followed a practice that was then prevalent in Marion County which was aided by the rules of both courts, which provided that the bail money would be returned to the defendant and not the person depositing the same.
>
> "* * * * *.
>
> "The accused felt at the time that the bail assignments were obtained and his status was converted from a court appointed attorney to one entitled to a fee, that there was nothing wrong with the transaction and only through hindsight did he feel that he had any duty to advise the persons depositing bail on behalf of the defendants."

The Disciplinary Review Board recommended that the accused should receive a public reprimand. Miller petitioned this court "to adopt the decision of the Disciplinary Review Board insofar as it concurs in the recommendation of the Trial Board that the accused be publicly reprimanded."

With some reluctance, we conclude that the public reprimand recommended by the Disciplinary Review Board is sufficient. This opinion shall serve as the public reprimand.

Costs to Oregon State Bar.

---

[5] We make no finding as to the ownership of the security deposit refund after the clerk returns it to the accused or to the attorney of record. ORS 135.265(2).