OSB Nos. 89-2 and 89-30 argued and submitted August 27, 1991, reassigned September 15; OSB Nos. 90-91, 90-92, and 90-93 argued and submitted September 3, accused is suspended from the practice of law for 63 days commencing on the effective date of this decision dated October 29, 1992

# In re Complaints as to the Conduct of

## James E. WILLIAMS,
*Accused.*

(OSB 89-2; 89-30) (OSB 90-91; 90-92; 90-93)
(SC S38051)
(Consolidated for Opinion)

840 P2d 1280

James E. Williams, Beaverton, argued the cause and filed the brief *in propria persona*.

Susan K. Roedl, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the response brief for the Oregon State Bar.

Mary A. Cooper, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the briefs for the Oregon State Bar.

Eric E. Lindenauer, of Garvey, Schubert & Barer, Portland, argued the cause and filed the response for the accused.

PER CURIAM

Unis, J., filed a dissenting opinion.

## PER CURIAM

This opinion involves two separate disciplinary cases filed against the accused, James E. Williams. We have consolidated the two proceedings for this opinion.

### A. THE FIRST PROCEEDING

In this disciplinary proceeding, the Oregon State Bar charged the accused with violations of DR 1-102(A)(3) (conduct involving dishonesty, fraud, deceit, or misrepresentation), DR 1-102(A)(4)[1] (conduct prejudicial to the administration of justice), and DR 9-101(A)[2] (failure to maintain client's funds in identifiable trust account). The trial panel of the Oregon State Bar Disciplinary Board found the accused not guilty of violating DR 1-102(A)(4) and guilty of violating DR 1-102(A)(3) and DR 9-101(A), imposing a reprimand for each of the two violations.

The accused seeks review of the trial panel's finding that he violated DR 1-102(A)(3). He does not seek review of the trial panel's finding that he violated DR 9-101(A). We review *de novo*. ORS 9.536(3). The Bar has the burden of establishing disciplinary violations by clear and convincing evidence. BR 5.2.

---

[1] DR 1-102(A)(3) and (4) provide:

"It is professional misconduct for a lawyer to:

"* * * * *

"(3) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

"(4) Engage in conduct that is prejudicial to the administration of justice[.]"

[2] DR 9-101(A) provides:

"All funds of clients paid to a lawyer or law firm, including advances for costs and expenses, and escrow and other funds held by a lawyer or law firm for another in the course of work as lawyers, shall be deposited and maintained in one or more identifiable trust accounts in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:

"(1) Funds reasonably sufficient to pay account charges may be deposited therein.

"(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client in which event the disputed portion shall not be withdrawn until the dispute is finally resolved."

The issues presented for review are (1) whether the accused made a misrepresentation, in violation of DR 1-102 (A)(3), and, if so, (2) whether that violation, in addition to the violation of DR 9-101(A), warrants that the accused receive more than a reprimand. The Bar argues that the trial panel's finding that the accused committed two disciplinary rule violations is correct, but asks that the court impose a suspension of no less than 30 days for those violations.

Concerning DR 1-102(A)(3), we find: On December 2, 1986, Mr. and Mrs. Durham were landlords. Their tenant was Erin Nugent. On behalf of Nugent, on December 2, 1986, the accused wrote a letter to the Durhams. The letter read as follows:

"I represent Erin Casey Nugent who is your tenant in the house located at 1910 20th Street, NE, Salem, Marion County, Oregon.

"There are some serious maintenance and repair problems existing in that house, all of which are your responsibility under the Oregon Residential Landlord and Tenant Act (ORLTA). These include:

"1. Repair entire electrical system
2. Repair roof leaks
3. Repair cooking stove
4. Provide adequate heat in all rooms
5. Repair or replace waterheater
6. Repair bathtub drain
7. Repair broken and loose windows
8. Weatherize doors and windows
9. Clean chimney

"The first five items listed are essential services according to law. If you do not take immediate action to make those repairs and supply those essential services, my client will pursue the remedies available to her including but not limited to, causing the necessary work to be done and deducting the value of that work from her rent, and seeking damages in court.

"Further, until such time as you make arrangements to make *all* the repairs and perform all the maintenance set forth above as required by law, all rent payments will be placed in a trust account to assure your compliance.

"Please contact me immediately to make arrangements to effect these repairs, or if you wish to designate persons to do the work on items 1 through 5.

"All further communications or notices to my client under the ORLTA are to be directed in care of this office."

After receiving that letter, Mrs. Durham talked to the accused on December 3 or 4. Before the trial panel, she testified as follows:

"Q   Will you please tell the panel the content of your conversation with Mr. Williams?

"A   Oh, you know, we were dumbfounded. I asked him what — you know, about the letter. And he reiterated that he had our rent money, and he said that we had 24 hours to make all the repairs on the list in his letter, or he would have them done —

"Q   Okay.

"A   — And sue us.

"Q   Did you ask him anything?

"A   I said what gives you the right to keep our rent money. We know nothing about this. And he says I have it. I can do it.

"Q   Was anything else said to you by Mr. Williams at that time?

"A   That threat was repeated two to three times. And I hung up on him."

The accused denies making those statements to Mrs. Durham.

On December 10, 1986, the accused again wrote to the Durhams as follows:

"Because you have chosen to ignor [sic] written and oral demands that you provide essential services required under the Oregon Residential Landlord and Tenant Act, we will be making arrangements with licensed contractors to make needed repairs to the roof, electrical system, cooking stove and waterheater, and to install space heaters. **The cost of this work will be paid out of the rent payments held in trust, at the rate of $200.00 per month as provided by law.**

"We will not hesitate to invoke the full protection of the law to prevent any further harassment of my client by you, by phone or in person." (Bold emphasis added.)

On December 10, the accused had none of the Durhams' rent money in his trust account. On or about

December 12, Nugent gave the accused a check for $250, which was to be placed in the accused's trust account. The accused did not deposit the $250 in his trust account.

Mr. and Mrs. Durham hired an Albany lawyer named Kent Hickam. Hickam wrote to the accused on December 13, 1986, as follows:

> "I represent Steve and Karolyn Durham regarding the landlord/tenant matter concerning your client, Erin Casey Nugent. Please direct all future communications concerning this matter to me at the above address.
>
> "* * * * *
>
> "You also have no basis to hold the December rental payment in your trust account. We insist that the rent be paid immediately as it is now overdue."

Hickam and Mr. and Mrs. Durham all testified that they understood, from the accused's letters, that he was holding Nugent's rent in his trust account to pay for the cost of repairs. Nugent moved out on or after December 15, 1986. The accused returned the check to Nugent, but he did not advise Hickam or the Durhams that the $250 was not in his trust account. He wrote a letter terminating the tenancy effective January 3, 1987. Not until several years later, when he was ordered to respond, did the accused tell his opponent that he held no funds in his trust account.

In its answering brief, the Bar states:

> "The Bar does not dispute Mr. Williams' assertion that the December 12 [sic: December 2] and December 10 statements regarding his intent to hold Ms. Nugent's rent in trust were true when he made them. However, once he and Ms. Nugent altered their plans and he no longer intended to hold her rent in trust, the Durhams' (and their attorneys') reasonable beliefs were no longer true. An attorney's deliberate failure to correct a misimpression he or she has created is a misrepresentation in violation of DR 1-102(A)(3)."

Although this concession is ambiguous (we are unsure whether the Bar is stipulating that the letters of December 2 and 10 contained no misrepresentation, or whether the Bar is stipulating only that the accused "*intended* to hold her rent in trust" (emphasis added)), we give the accused the benefit of the doubt and will limit our discussion to whether the

accused's "deliberate failure to correct a misimpression he or she has created is a misrepresentation in violation of DR 1-102(A)(3)."

The statement that "[t]he cost of this work will be paid out of the rent payments held in trust" was material to the issue whether Nugent had breached the rental agreement. The accused's statement that the rent would be held "in trust" suggested that the tenant was delivering (or had delivered) the rent to the accused, and that the rent money would be held (or was being held) by the accused for the benefit of the landlords, either for repairs or for rent, or both. The statement suggested that the tenant was not, and would not be, behind in her rent payments. Whether the landlords had a right to terminate the rental agreement "after 72 hours' written notice of nonpayment," and to take possession, turned on whether the rent was unpaid. ORS 90.400(2).

Moreover, in an action for possession based on non-payment of rent, the tenant's right to counterclaim may turn on whether the tenant has deposited the rent into court. ORS 90.370. The accused himself testified that this was one of the reasons that he represented that the rent payments were held in trust. From the point of view of the landlords and their lawyer, the likely availability of rent money was a material consideration affecting the landlords' choice among available courses of action, and the accused intended to affect the landlords' potential choices of action.

Hickam's letter of December 13, 1986, establishes his belief that the rent was in the accused's trust account. It was reasonable for Hickam to so conclude. On December 13, 1986, whether or not the rent was in the trust account was material to the dispute between the Durhams and Nugent. When the accused returned the check to Nugent, he should have advised Hickam that the representation contained in the accused's earlier letters no longer was true.

■ A misrepresentation can be made by making an assertion that is not in accordance with the truth when made, *Scott v. Francis*, 314 Or 329, 838 P2d 596 (1992), or by failing to correct a representation that, although true when made, is no longer true in the light of information later acquired. *In re Leonard*, 308 Or 560, 784 P2d 95

(1989), although not precisely in point, is instructive. In *Leonard*, the accused represented potential lessees in a complex transaction involving the leasing of real property. The potential lessors were also represented by their lawyer. There were negotiations concerning whether future adjustment of rent should be indexed to the Consumer Price Index. The accused knew that the potential lessors would not agree to any adjusted figure that fell below the initial floor of $8,850 per month.

Eventually, the lease was drafted to provide that in no event could the rent be reduced below $8,850 per month. The accused later modified the lease by interlineation, the effect of which was to permit the rent to fall below $8,850 per month. The accused did not inform the lessors' lawyer of the interlineation. He told Zeeb, a representative of another party to the complicated transaction, that the handwritten change "merely served to conform" one paragraph with another. 308 Or at 564. Zeeb communicated the information to the lessors, who initialed the lease without consulting with their lawyer. Three years later, the accused proposed to reduce the rent to $4,187.60. The other lawyer then learned, for the first time, of the accused's change to the lease agreement.

The court held that, in unilaterally modifying the lease agreement when the accused knew such modification to be contrary to the intent of the lessors, and in failing to disclose this change, the accused violated DR 1-102(A)(4) (now DR 1-102(A)(3)). The opinion states:

> "Likewise, 'misrepresentation' is a broad term encompassing non-disclosure of material fact; it need not be done with the intent to deceive or commit a fraud." 308 Or at 569.

Similarly, in the instant case, whether the rent money was in the accused's trust account was material in December 1986. The accused knew that the Durhams' lawyer believed that the rent was in the trust account. The accused had an affirmative duty to disclose the truth to the Durhams' lawyer when the accused returned his client's check to her.

We find that the accused made a material misrepresentation in failing to correct the representations contained in his letter of December 10, when he knew that others

believed that he held the rent in his trust account. Thus, the accused violated DR 1-102(A)(3).

## B. THE SECOND PROCEEDING

In this proceeding, the complaint contains four charges against the accused. The first charge alleges that the accused violated DR 7-104(A)(1) of the Code of Professional Responsibility (communicating with a person that the lawyer knows to be represented by another lawyer). We find the accused guilty of this charge.

The second charge alleges a violation of DR 2-110(A)(2) ("a lawyer shall not withdraw from employment until the lawyer has taken reasonable steps to avoid foreseeable prejudice to the rights of the lawyer's client"). The trial panel found the accused not guilty of this charge. We also find the accused not guilty of this charge.

The trial panel found the accused not guilty of the third charge, and the Bar has not sought review of that finding.

The fourth charge alleges that the accused violated DR 1-103(C) ("A lawyer who is the subject of a disciplinary investigation shall respond fully and truthfully"). We find the accused guilty of this charge.

*Alleged Violation of DR 7-104(A)(1).*

■      A tenant in a mobile home park was involved in a dispute with her landlord. She employed the accused to represent her. On October 2, 1987, the accused wrote to Thomas Rastetter, the landlord's lawyer, advising him that the accused represented the tenant.

ORS 90.600 requires the landlord to give at least 90 days' advance notice of a rent increase and an opportunity to meet with the landlord. In November 1987, after the tenant received a notice of a rent increase, the accused, with his client, met with Ms. Duckworth, the representative of the landlord, at the time and place specified by the landlord to discuss the proposed rent increase. At the meeting, the accused inquired if Mr. Rastetter was going to attend the meeting, and Ms. Duckworth said "no." The accused and his

client then spent about an hour discussing the proposed rent increase with Ms. Duckworth.

DR 7-104(A)(1) provides:

"During the course of the lawyer's representation of a client, a lawyer shall not:

"(1)   Communicate or cause another to communicate on the subject of the representation, or on directly related subjects, with a person the lawyer knows to be represented by a lawyer on that subject, or on directly related subjects, unless the lawyer has the prior consent of the lawyer representing such other person or is authorized by law to do so. This prohibition includes a lawyer representing the lawyer's own interests."

The accused asserts that he "was authorized by law to represent his client at a statutory rent increase meeting even if the landlord chose not to have an attorney attend."

ORS 90.600(1) requires a landlord who is raising the rent at a mobile home park to give each affected tenant an opportunity to meet with the landlord or a representative of the landlord to discuss the rent increase. Nothing in the text of ORS 90.600 suggests that the prohibition of DR 7-104 (A)(1) does not apply in this situation.[3] True, a tenant can choose to ask her lawyer to attend the meeting. Here, however, there was an ongoing dispute between the landlord and the tenant, and the accused *knew* that the landlord was represented by a lawyer, Rastetter. The proposed rent increase was the very matter in dispute between the landlord and the tenant. The accused was not "authorized by law" to communicate with Duckworth.[4] We find the accused guilty of violating DR 7-104(A)(1).

---

[3] There may be situations — such as statutes that require the giving of a notice, *see, e.g.,* ORS 20.080 — that imply that authorization to make the communication exists, notwithstanding knowledge of the lawyer that the other person is represented by a lawyer. *See also U.S. v. Schwimmer,* 882 F2d 22 (2d Cir 1989) (prosecutor may question a defendant represented by counsel before grand jury under "authorized by law" exception). ORS 90.600 is not such a statute, and this is not such a case.

[4] The accused also argues:

"If Williams were required to refrain from attending the meeting, then Duckworth, by choosing not to have her attorney attend, could have effectively negated Kimberly Baker's right to representation. The authorized by law exception prevents that result."

*Alleged Violation of DR 2-110(1)(2).*

The accused was charged with withdrawing from his representation of a client without taking steps to avoid foreseeable prejudice to the client. The trial panel found the accused not guilty of the charge. It would serve no purpose to set forth the facts on this charge. We agree with the trial panel's finding and therefore proceed to the last charge.

*Alleged Violation of DR 1-103(C).*

The accused was charged with violating DR 1-103 (C), which provides:

> "A lawyer who is the subject of a disciplinary investigation shall respond fully and truthfully to inquiries from and comply with reasonable requests of a tribunal or other, authority empowered to investigate or act upon the conduct of lawyers, subject only to the exercise of any applicable right or privilege."

A preliminary question must be addressed. This charge was filed after the deposition of the accused was taken on November 4, 1991. The accused refused to answer a number of questions and gave evasive answers to other questions. The accused objected to the admissibility of the deposition on the ground that he had not been given the deposition to examine for correctness. ORCP 39F. The trial panel sustained the accused's objection to introduction of the deposition on the ground that the accused had not had the opportunity to read and sign the deposition.

Depositions taken in Bar proceedings are governed by BR 4.5(b)(2), which provides that "[t]he manner of taking depositions shall conform as nearly as practicable to the procedure set forth in the Oregon Rules of Civil Procedure." ORCP 39F provides:

> "(1)  When the testimony [of a witness at deposition] is taken by stenographic means, or is recorded by other than stenographic means as provided in subsection C.(4) of this rule, *and if any party or the witness so requests at the time the deposition is taken*, the recording or transcription shall be submitted to the witness for examination, changes, if any,

---

Had Rastetter chosen not to attend the meeting, knowing that the accused would attend, a different case would be presented. That case is not before us.

and statement of correctness. With leave of court such request may be made by a party or witness at any time before trial.

"(2)    Any changes which the witness desires to make shall be entered upon the transcription or stated in a writing to accompany the recording by the party taking the deposition, together with a statement of reasons given by the witness for making them. Notice of such changes and reasons shall promptly be served upon all parties by the party taking the deposition. The witness shall then state in writing that the transcription or recording is correct subject to the changes, if any, made by the witness, unless the parties waive the statement or the witness is physically unable to make such statement or cannot be found. * * *

"(3)    If no examination by the witness is requested, no statement by the witness as to the correctness of the transcription or recording is required." (Emphasis added.)

The accused's depositions were taken on two occasions, on November 4 and 11, 1991. At the time that the first deposition was taken, the accused made no request to read and sign the deposition. The chairman of the trial panel was present during the second deposition in order to rule on objections made by the accused at the first deposition. The only request by the accused that the first deposition be submitted to him for his examination came during preliminary discussions at the second deposition, in which the accused stated, "I would request a copy of [the November 4] transcript so I may review it as is my right under the Oregon Rules of Civil Procedure * * *." The accused did not continue to press his request to examine the first deposition, apparently because Bar counsel forthwith agreed that he could do so. The accused made no further request in this regard, and he was given a copy of the deposition before trial. The accused's reliance on ORCP 39F(1) is without substance.

█    The accused also objected to admission of the deposition transcript, citing BR 4.5. The accused's position on this claim is:

"Bar Rule 4.5 provides that deposition practice shall conform to the Oregon Rule of Civil Procedure and further provides that:

" '(c)    Discovery procedure. *All discovery questions shall be resolved by the trial panel chairperson on motion.*

Discovery motions, including motions for limitation of discovery shall be in writing. All such motions shall be filed with the trial panel chairperson and a copy mailed to Bar counsel or the accused, and disciplinary counsel.

" '(e)   Discovery sanctions. For failure to provide discovery as required under BR 4.5, the trial panel chairperson may make such rulings as are just, including, but not limited to, the following:

" '(1)   a ruling that the matters regarding which the ruling was made or any other designated fact shall be taken to be established for the purposes of the proceeding in accordance with the claim of litigant obtaining ruling; or

" '(2)   a ruling refusing to allow the disobedient litigant to support or oppose designated claims or defenses, or prohibiting the disobedient litigant from introducing designed matters in evidence.'

"Hence, the proper procedure for the Bar to address any contention that Williams failed to appropriately respond to deposition questions was by motion to the trial panel chairperson. The chairperson was empowered to impose sanctions, up to and including establishment of claims or refusal to allow defenses. The procedure adopted by the Bar in Rule 4.5 is the only sensible approach to depositions in disciplinary proceedings.

"Otherwise, a *pro se* defendant such as Mr. Williams would be chilled from adequately representing himself by the threat of a new disciplinary charge or enhanced sanctions. Any other rule would discriminate against the *pro se* defendant, since presumably the Bar would not bring charges against a lawyer who merely followed an attorney's instructions in refusing to answer questions. A *pro se* defendant facing questioning from Bar counsel in a formal deposition would be placed at an extreme disadvantage if he or she could not make objections or refuse to answer questions while acting in the dual roles of advocate and witness." (Emphasis in original; footnote omitted.)

The trial panel excluded the depositions, noting that "the Bar never asked the trial panel chairman to provide sanctions as permitted under rule 4.5(e) of the Oregon State Bar Rules of Procedure." The availability of sanctions under BR 4.5 does not preclude charging a lawyer with unethical

conduct under DR 1-103(C). We turn then to the depositions to determine whether the accused violated DR 1-103(C).

■　　The Bar's amended complaint contained the following allegations:

"3.

"In or about November, 1988, the Accused attended a meeting between his client, a tenant, and Shirley Duckworth (hereinafter 'Duckworth'), the landlord or landlord's representative. The purpose of the meeting was to discuss a proposed rent increase and other matters which were the subject of a dispute between the Accused's client and Duckworth.

"4.

"At the time of the meeting, the Accused knew that Duckworth was represented by counsel and expected that the attorney would attend the meeting. When Duckworth appeared at the meeting alone, however, the Accused proceeded with the meeting and discussed issues relating to the dispute without first obtaining Duckworth's attorney's permission."

In his answer, the accused denied those allegations.

At the November 4 deposition, the accused was questioned about paragraphs 3 and 4 of the complaint as follows:

"Q　Mr. Williams, in November of 1988, did you attend a meeting with your client and a Ms. — I believe it was Shirley Duckworth — regarding your client's tenancy?

"A　Do you have my answer?

"Q　Yes.

"A　Read it.

"Q　You deny that you attended the meeting?

"A　Gee, that's very good. You can read.

"Q　Do you deny that you attended a meeting in November of 1988?

"A　Do you have my answer?

"Q　Yes.

"A　Read it.

"* * * * *

"Q Now, Mr. Williams, you know that the bar will present evidence and testimony that Ms. Baker was tenant of yours — excuse me, a client of yours?

"A That's fine.

"Q You deny that she was a client of yours?

"A I'm not answering the question.

"Q Because it's privileged, in your opinion?

"A Uh-huh.

"Q Do you remember Shirley Duckworth?

"A I couldn't say that I'd recognize her if I saw her.

"Q Do you recall a meeting of November 1988?

"A No, I don't recall a meeting in November of 1988.

"Q Do you deny there was a meeting in November of 1988?

"A No. I don't recall.

"Q Your answer denies it.

"A Then I will stand by my answer.

"Q You're denying that in November of 1988 you attended a meeting?

"A What does my answer say?

"Q It says it denies the allegations set forth in paragraph three.

"A Then I'm denying the — denying the allegations set forth in paragraph three.

"Q The entire allegation?

"A The entire allegation.

"Q You have the complaint. Would you like to review that before you make that statement?

"A I don't need to review it. My answer is accurate. If I wish to change it in my answer I'll let you know.

"Q Now's the time to let me know. You're under oath.

"A I choose to stand by my answer.

"Q I'm going to read this then ask you — and this may be time consuming, but I have to do it this way.

"Mr. Williams, in November of 1988, did you attending a meeting between your client, Kimberly Baker, and Shirley Duckworth and the — and the purpose of the meeting was to

discuss a proposed rent increase as a subject dispute between your client and Ms. Duckworth? Do you admit or deny that?

"A You have my answer. Read it.

"Q It denies it.

"A If that's what it says, I'll stand by my answer.

"Q Mr. Williams, you understand you're under oath right now?

"A Yeah. I understand I'm under oath. And I also know that when I signed my answer, that that was the equivalent of an oath, as well. I'll stand by my answer. I'm not going to repeat my answers here.

"\* \* \* \* \*

"Q Regarding paragraph four, at the time of the meeting in November of 1988, did you know Ms. Duckworth was represented by counsel?

"A I'm not going to respond to any more questions that I've already answered in the answer.

"Q Your answer was denial. Are you denying that you knew she was represented by counsel?

"A If you don't get on to another subject fairly quickly, I'm going to leave. You're wasting my time. You haven't asked me one substantive question in 40 minutes.

"\* \* \* \* \*

"Q Did you understand at that meeting that Ms. Duckworth was represented by counsel?

"A No, I didn't."

From our examination of the depositions (and the accused's answer to the Bar's complaint, as well), we are convinced that the accused responded neither fully nor truthfully. Therefore, a violation of DR 1-103(C) has been made out.

We agree with the accused that an accused "facing questioning from Bar counsel in a formal deposition would be placed at an extreme disadvantage if he or she could not make objections or refuse to answer questions while acting in the dual roles of advocate and witness." Disciplinary proceedings before trial panels are adversary proceedings. Our ruling does not intend to foreclose any objection that has a basis in fact or law, actual or theoretical. Here, other objections made by the

accused had some basis, actual or theoretical. We have no doubt, however, that many of the accused's objections had, as their justification, nothing more than the venting of displeasure at the Bar for bringing these proceedings.[5] The portions of the examination set forth above demonstrate that the accused was simply saying to the Bar, "I don't like what you are trying to do to me, and I will refuse to cooperate." That created the foundation for a further charge of a violation of DR 1-103(C).

## C. SANCTION

■ This court frequently looks to the American Bar Association Standards for Imposing Lawyer Sanctions (1986) in considering sanctions for unethical conduct. Those standards call for consideration of four factors.

### 1. *The Ethical Duty Violated.*

By leading the opposing parties and their lawyer to continue to believe that he held his client's rent payments in trust, when he did not, the accused violated a duty owed to the legal system. ABA Standard 5.

We have also found the accused guilty of communicating with a person known to be represented by a lawyer, DR 7-104(A)(1), and failing to respond fully and truthfully in the course of a disciplinary investigation, DR 1-103(C). In so doing, the accused violated a duty owed to the legal system.

■ ### 2. *The Lawyer's Mental State.*

"Intentionally" is the most culpable mental state defined by the ABA Standards for Imposing Lawyer Sanctions. An act is "intentional" if it is done with conscious objective or purpose to accomplish a particular result.

The accused acted intentionally when he failed to correct the representation that led the Durhams and their lawyers to believe that his client had entrusted her rent to him. We also find that the accused acted intentionally in

---

[5] We note the possible application of DR 7-102(A)(1) and (5), which state that a lawyer, in representing a client, "or in representing the lawyer's own interests," shall not "(1) * * * assert a position, conduct a defense, delay a trial, or take other action * * * when the lawyer knows or when it is obvious that such action would serve merely to harass * * * another" nor "(5) [k]nowingly make a false statement of law or fact."

contacting a represented party and in failing to cooperate with the Bar.

3. *The Extent of Injury, Actual or Potential, Caused by the Misconduct.*

■　Because the purpose of professional discipline is to protect the public, an injury need not be actual, but only potential, in order to support the imposition of a sanction. The accused's misrepresentations regarding Nugent's December 1986 rent apparently resulted in no injury to his opposing parties or opposing counsel. There was, however, a potential injury, because whether the rent had been "paid" by delivery of the rent to the accused potentially affected the landlords' rights.

In the Duckworth matter, there was the potential that the accused's wrongful communication with Ms. Duckworth might have prejudiced the landlord's interests. The accused's noncooperation with the Bar created injury to the profession and the ability of the Bar to investigate the conduct of lawyers.

4. *Aggravating and Mitigating Factors.*

In the first proceeding, mitigating factors evidenced on the record are interim rehabilitation (ABA Standard 9.32(j)) and the absence of a dishonest or selfish motive (ABA Standard 9.32(b)). There are two aggravating factors, substantial experience in the practice of landlord-tenant law (ABA Standard 9.22(i)) and the accused's refusal to acknowledge the wrongful nature of his conduct (ABA Standard 9.22(g)).

In the second proceeding, aggravating factors include: a pattern of misconduct; refusal to acknowledge the wrongful nature of the conduct; and substantial experience in the practice of law. ABA Standard 9.22(c), (g), and (i).

Misrepresentation is a serious violation of the disciplinary rules. Oregon ethics law contains several cases in which lawyers who have been found guilty of only one charge of dishonesty have received suspensions ranging from two to four months. In *In re Fuller*, 284 Or 273, 586 P2d 1111 (1978), a lawyer was suspended for 60 days for violating DR

1-102(A)(4) (current DR 1-102(A)(3)) and ORS 9.480(4) (current ORS 9.527(4)) (willful deceit or misconduct). In *In re Hiller and Janssen*, 298 Or 526, 694 P2d 540 (1985), the lawyers were suspended for four months for violating DR 1-102(A)(4) (current DR 1-102(A)(3)) and ORS 9.460(2) (failure to employ only those means that are consistent with the truth, and seeking to mislead the court).

Oregon precedent offers another line of cases in which lawyers have received reprimands for single acts of misconduct. In *In re Hubert*, 265 Or 27, 507 P2d 1141 (1973), a lawyer who failed to correct an inadvertent misrepresentation to the court after he discovered the incorrectness of his statement received a reprimand. In *In re Miller*, 287 Or 621, 601 P2d 789 (1989), a lawyer was reprimanded for failing to advise persons depositing bail for his clients that the bail would be returned to the clients and not to the depositors and for further failing to advise these individuals that his fee would be paid from the bail money deposited. In *In re Simms*, 284 Or 37, 584 P2d 766 (1978), a lawyer was reprimanded for signing a client's name and then notarizing the signature.

Considering the violations in both proceedings, given the duties violated and the extent of actual or potential injury, the analysis under the ABA Standards strongly suggests that a suspension is appropriate in this case. The fact that there are multiple charges and aggravating circumstances also suggests that a suspension is appropriate.

For his violations in both proceedings, we order that the accused be suspended from the practice of law for a total of 63 days commencing on the effective date of this decision. The Oregon State Bar is awarded its actual and necessary costs and disbursements. ORS 9.536(4).

**UNIS, J.,** dissenting.

In the first of the two disciplinary proceedings involved in this case (discussed in Parts A and C of the majority opinion), the trial panel found, the Bar does not dispute, and the majority struggles to accept, that the intent of the accused was accurately represented by the letters of December 2 and December 10 at the time that he wrote them, *i.e.*, that at the time the accused wrote the December 2 and 10

letters, he intended to hold Nugent's rent payments in trust.[1] See 314 Or at 535. The majority bases its finding of a misrepresentation on the accused's failure to inform landlords several days later that his client's plans had changed and that the accused had been instructed not to hold the rent money in trust because his client intended to terminate the tenancy. The majority concludes that "whether the rent money was in the accused's trust account was material in December 1986." 314 Or at 537.

Although the majority concludes that the alleged misrepresentation was intentional[2] and material, the majority does not define the term "material." Rather, the majority confuses the significance of the facts in light of the landlords' statutory rights. The majority derives the materiality of the alleged misrepresentation from the landlords' rights in ORS 90.400(2) based on the significance of whether "rent was unpaid" and in ORS 90.370 based on the significance of whether "tenant has deposited the rent into court." 314 Or at 536. The answer to both of these questions is totally independent of whether the rent was being held in trust by tenant's lawyer. That is, rent is not paid under ORS 90.400(2) by depositing it in trust with one's lawyer, and rent is not deposited into court under ORS 90.370 by depositing it in trust with one's lawyer. Even if the accused was holding the rent money in trust, the rent was still unpaid and had not been deposited into court.

Although the majority accepts the trial panel's finding, which the Bar does not dispute, that the accused's representations in the December 2 and 10 letters were true when he made them (*i.e.*, that at the time the accused wrote the December 2 and 10 letters, he intended to hold Nugent's rent payments in trust, but was not yet doing so), 314 Or at 535, the majority makes statements contrary to this finding that are significant to the majority's analysis.

---

[1] The trial panel found that "[a]t the time the Accused wrote the two letters to the Durhams *the representations contained therein were true.*" The Bar in its brief before this court agrees with that finding: "The *Bar does not dispute* [the *accused's*] assertion that the December 12 [*sic*: 2] and December 10 *statements* regarding his intent to hold Ms. Nugent's rent in trust *were true when he made them.*" (Emphasis added.)

[2] I disagree with the majority's conclusion, 314 Or at 546, that any misrepresentation was intentional.

The majority states that the accused's statement that "[t]he cost of this work will be paid out of the rent payments held in trust" "suggested that the tenant was not * * * behind in her rent payments." 314 Or at 536. Rent was due on December 1. The majority accepts that the representations in the accused's letters were true when he made them. The majority states as fact (and it is not disputed) that "[o]n December 10, the accused had none of the Durhams' rent money in his trust account." 314 Or at 534. Therefore, it is clear that on December 10 the tenant was behind in her rent payments *and that the majority agrees that the accused did not state to the contrary.* Nevertheless, the majority bases its finding that the accused made a material misrepresentation on the conclusion that the accused's statements "suggested that the tenant was not * * * behind in her rent payments." 314 Or at 536.[3] Thus, the majority is basing its finding of intentional material misrepresentation on representations that even the majority agrees the accused did not make.

The majority suggests that the "tenant's right to counterclaim may turn on whether the tenant has deposited the rent into court. ORS 90.370." 314 Or at 536. In determining why the accused's statements were intentional, material misrepresentations, the majority concludes that "[t]he accused himself testified that this [determination of the right to counterclaim] was one of the reasons that he represented that the rent payments *were held in trust.*" 314 Or at 536 (emphasis added). The trial panel found, the Bar accepts, and the majority accepts that the accused did not represent in his letters that he was holding rent money in trust. Unfortunately, the majority resorts to statements contradicting the very premise it accepts in order to find an intentional, material misrepresentation.

In addition, the majority states that "[t]he accused's statement that the rent would be held 'in trust' suggested

_____

[3] The majority includes in its analysis two other parenthetical statements that contradict its acceptance of the finding that the representations in the December 2 and 10 letters were true when they were made: "The accused's statement that the rent would be held 'in trust' suggested that the tenant was delivering (*or had delivered*) the rent to the accused, and that the rent money would be held (*or was being held*) by the accused for the benefit of the landlords, either for repairs or for rent, or both." 314 Or at 536 (emphasis of majority's statements contradicting majority's premise added).

that the tenant was delivering (or had delivered) the rent to the accused, and that the rent money would be held (or was being held) by the accused for the benefit of the landlords, either for repairs or for rent, or both." 314 Or at 536. By suggesting that money which the accused was holding or would hold in trust was "for the benefit of the landlords," the majority misconstrues the nature of the lawyer's role and implicitly suggests that the accused should have done something which itself would have been a disciplinary violation, even while the majority must strain to conclude that what the accused did was a disciplinary violation. Lawyers are obligated by disciplinary rule to deposit client funds in a "separate interest bearing account for a specific and individual matter for a particular client," DR 9-101(C)(3)(a), unless they are in a pooled account with subaccounting, DR 9-101 (C)(3)(b), or are nominal or held for a short period of time, DR 9-101(C)(2). DR 9-101(B)(4) provides that "[a] lawyer shall * * * [p]romptly pay or deliver to a client as requested by the client the funds, securities or other properties in the possession of the lawyer which the client is entitled to receive." The majority's suggestion that money held in trust by the lawyer would be held for the benefit of the landlords rather than for the benefit of the client contravenes the very nature of the attorney/client relationship and the rules of client trust funds.

The majority must strain too hard to establish a disciplinary violation. That is not palatable, particularly when the standard of proof is clear and convincing evidence.

I would hold that the Bar has failed to establish by clear and convincing evidence that the accused violated DR 1-102(A)(3), *i.e.*, that there was a misrepresentation or that, if there was a misrepresentation, it was intentional and material. Notwithstanding the analytical problems in the majority opinion, I would hold that the Bar has failed to establish, as the majority holds, see 314 Or at 537, that it was material for landlords to know whether the rent money was in the accused's trust account in December 1986.[4] I therefore dissent from Part A of the majority opinion. I would impose a

---

[4] The Bar argues that there were continuing misrepresentations for failure to inform landlords after the termination of the tenancy (*i.e.*, after December) that he was not holding money in trust. In my view, even assuming, *arguendo*, a material misrepresentation in December, the changed circumstance of the termination of the

lesser sanction than the sanction imposed by the majority in Part C consistent with my conclusion that the only violations established are those discussed in Part B, with which I agree.

---

tenancy meant that there was no continuing misrepresentation after that date. That is, even if the question whether the accused was holding rent in trust was legally significant in December, it was no longer relevant after December, and termination of the tenancy was adequate to apprise landlords of this fact without affirmatively informing landlords that the accused was no longer holding rent money in trust.

If there was a continuous misrepresentation beyond December, the accused's disciplinary rule violation would be more severe. I therefore take the majority's silence on the issue of a misrepresentation continuing after December to imply that no continuous misrepresentation existed. If that is the case, I agree.